IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JONATHAN ANDERSON | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. PWG-15-3967 |
| CODY GILPIN, *et al.* | * | |
| Defendants | * | |

***

## MEMORANDUM OPINION

Pending is Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment. ECF No. 31. Plaintiff was advised of his right to respond to the motion and of the consequences of failing to do so, ECF No. 32, but has not opposed the motion. The Court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2016). Because a genuine dispute exists as to the material facts, Defendants' motion, construed as a Motion for Summary Judgment, shall be denied.

## BACKGROUND

Plaintiff Jonathan Anderson was at all relevant times an inmate committed to the custody of the Maryland Department of Public Safety and Correctional Services ("DPSCS") and confined at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland.[1] At NBCI, the practice of holding the feed-up slot open on a cell door is a breach in security. *See* Passman Decl. 1. Allowing the slot to remain open permits an inmate the opportunity to "throw what is known as a 'correctional cocktail,' which is a [m]ixture of liquid and human excrement." *Id*. Attempts to prevent an officer from closing the slot is a violation of institutional rules. *Id*.

---

[1] Anderson has been released from custody. *See* Notice Change of Address, ECF No. 28.

On October 9, 2015, at approximately 9:30 a.m., Officer Cody Gilpin came to Anderson's cell to deliver his lunch tray. *See* Compl. 3, ECF No. 1. In his verified Complaint, Anderson alleges that, as he was retrieving the lunch tray from the cell food slot, Officer Gilpin closed the slot on his right hand. *Id.* Despite the food slot being partially closed, Anderson was able to maneuver his hand to release the food tray and his hand. *Id.* He alleges that Gilpin then smiled and stated, "I'll chop your hand off." *Id.* at 4. When the events of October 9, 2015 later were investigated, Anderson reported that Gilpin closed the door on the food tray, but he did not mention that his hand was in the slot or that Gilpin made any threats. *See* IID Rept. 9–10.[2]

After Anderson ate his lunch, Gilpin returned to his cell to collect the tray, and Anderson asked to speak with Sergeant Janet Puffenbarger. *See* IID Rept. 9; Compl. 4; Passman Decl. 1. Anderson admitted that he "put his right hand in the [food] slot to prohibit the slot from closing." IID Rept. 9; *see* Passman Decl. 1. Officer Gilpin told Anderson that "the Sergeant was not going to do anything for [him]," and ordered him to remove his hand from the slot, where Anderson was holding the tray. Compl. 4. Anderson repeated his request to see a supervisor and Gilpin walked away. *Id*.

Shortly after, Gilpin returned, accompanied by Officer Nathanial Passman. Compl. 4; IID Rept. 9. Passman stated that Gilpin had asked him to assist him in collecting Anderson's food tray. Passman Decl. 1. According to Anderson, Passman threatened to pepper spray him in the face if he did not remove his hand from the tray in the slot and, before he could respond to

---

[2] Exhibit 1 to Defendants' Memorandum, ECF No. 31-2, includes Passman's Declaration, an Information Report Form, the Notice of Inmate Rule Violation, the Notice of Inmate Disciplinary Hearing, and the Inmate Hearing Record. Exhibit 2 to Defendants' Memorandum, ECF No. 31-3, is the IID Report. The page numbers for the IID Report refer to the Bates stamps at the bottom of the pages.

the command, Officer Passman "shut the slot on [Anderson's] hand," causing injury.  Compl. 4; IID Rept. 9.

Passman recalled a different sequence of events.  According to Passman, when he arrived at Anderson's cell with Gilpin, Anderson had "jammed the rubber tray in the feed slot, using it to prevent the sliding slot door from closing."  Passman Decl. 2; IID Rept. 10.  Anderson was still demanding to speak with Sergeant Puffenbarger, so Passman informed Anderson he would have to be handcuffed in order to see the sergeant.  Passman Decl. 2.  Anderson responded with obscenities and insisted that Puffenbarger come to his cell to talk to him.  *Id.*  Passman then tried to remove the tray so that the slot could be closed, as it was against institutional rules for an inmate to keep the slot open; closing the slot would eliminate the potential security threat.  *See id.*  He "dislodge[d] the tray by … forcefully clos[ing] the sliding slot."  *Id.*; IID Rept. 10.  Passman asserted that Anderson's hand was not in the slot at that time; however, Anderson then "abruptly stuck his hand out," in an attempt "to stop [Passman] from completely securing it," causing the sliding slot to hit Anderson's hand upon closing.  Passman Decl. 2; *see* IID Rept. 10; Information Report Form.  Passman stated that "[he] did not see his hand in time to prevent the sliding slot from hitting it, nor did [he] do it on purpose."  Passman Decl. 2; *see* IID Rept. 10.

Officer Gilpin reported that Anderson refused to remove his hand from the food slot, and therefore, Sergeant Puffenbarger ordered Anderson to be brought to her office.  IID Rept. 11.  When Gilpin and Passman arrived at Anderson's cell, Anderson refused to be handcuffed.  *Id.*  At some point, Passman closed the food slot on Anderson's hand; however, Gilpin did not observe how it happened.  *Id.*

In his Complaint, Anderson claims that, as a result of Passman closing the slot on his hand, he suffered a "severe contusion" to his hand that required immediate medical treatment.

3

Compl. 4. He states that "there was blood everywhere on the slot" and that he "had to receive several stitches." *Id*. Though he requested immediate medical attention, treatment was not provided until twenty-five minutes later. *Id.* at 5. During the investigation of the event, however, Anderson did not say that he immediately requested medical treatment. Rather, Anderson reported that his hand was stuck in the food slot for fifteen to twenty minutes, and it was not until Officer Jamey Durst arrived at his cell to escort him to see Sergeant Puffenbarger that the officers noticed his hand was stuck and injured, and he then was taken to the medical unit and received treatment. IID Rept. 9. He claims that he still suffers with pain in his hand and that he cannot feel his hand during cold weather. Compl. 4-5. As relief, Anderson seeks compensatory and punitive damages.[3] *Id*. at 3.

According to Passman, when he saw that the door had struck Anderson's hand, he immediately pulled the slot open. Passman Decl. 2; IID Rept. 10. There was no bleeding at the time, but medical attention was offered to Anderson, which he declined. Passman Decl. 2; IID Rept. 10. Shortly after the incident, however, Officer Jamey Durst went to Anderson's cell and convinced him to have his hand looked at by medical personnel. Passman Decl. 2; IID Rept. 10. At this point, Passman "noticed that Mr. Anderson's hand was bleeding and reported it to Sgt. Puffenb[a]rger." Passman Decl. 2.

As a result of the incident, Anderson received a Notice of Inmate Rule Violation and a Notice of Inmate Disciplinary Hearing. At an adjustment hearing held on October 13, 2015,

---

[3] On February 22, 2016, Anderson supplemented the complaint and alleged that his hand was again closed in the feed up slot and that he was being harassed by correctional officers. *See* Suppl. Compl. 1, ECF No. 16. Because Anderson did not seek leave to amend the complaint to include the additional allegations raised, the allegations in the supplemental complaint are not addressed in this case. In any event, they would not change the outcome of this analysis.

Anderson pled guilty to violating three rules,[4] "was administrative[ly] sanctioned and received 60 days of segregation." IID Rept. 11.

On October 19, 2015, Anderson submitted a Request for Administrative Remedy Procedure ("ARP"), claiming that he was assaulted by Officer Gilpin and Officer Passman, and would like to file formal charges. *See* IID Rept. 14. Based on the assault described in Anderson's ARP, Sergeant Chris Burton of the Internal Investigative Division ("IID") conducted an investigation into Anderson's claim. *Id.* at 8. During the investigation, Burton interviewed Anderson, Officer Passman, and Officer Gilpin. *Id.* at 9-12. He also reviewed medical records surrounding the alleged assault and video recording from Anderson's cell. *Id.*

Burton reported that Anderson had "initially submitted a written statement claiming that no assault occurred." *See id.* at 10. Anderson stated that he "wrote the statement because [the officers] promised him that he could be moved off the tier and placed into a special program." *Id*. However, after a week passed and he was not moved, Anderson submitted the ARP reporting the assault. *Id*.

At the conclusion of his investigation, Burton found that "there was no definitive evidence to indicate that Officer Nathaniel Passman intentionally closed the food slot on the right hand of Inmate Anderson. Therefore no criminal charges were filed." IID Rept. 12.

## STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or

---

[4] Anderson was charged with violating Rule 116 (tampering with security equipment or property), Rule 312 (interfering with or resisting the performance of staff duties), and Rule 400 (disobeying an order). *See* IID Rept.

other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* On a motion for summary judgment, I consider the facts in the light most favorable to Plaintiff as the non-moving party, drawing all justifiable inferences in his favor. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Titan Indem. Co. v. Gaitan Enters., Inc.*, No. PWG-15-2480, 2016 WL 6680112, at *1 (D. Md. Nov. 14, 2016).

## ANALYSIS

Defendants argue that Anderson "fails to show that excessive force was used." Defs.' Mem. 8. Whether force used by prison officials was excessive, in violation of the Eighth Amendment's prohibition of cruel and unusual punishment, is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This Court must consider "'the need for application of force; the relationship between th[at] need and the amount of force'" applied; "'the extent of the injury inflicted,' . . . the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts

known to them, and any efforts made to temper the severity of a forceful response." *Whitley v. Albers*, 475 U.S. 312, 321 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id*. at 38.

    Defendants offer evidence that the injury Anderson sustained was the result of an accident, and not an intentional application of force, as Passman was trying to force closed the food slot where Anderson had jammed his tray. Certainly, it is undisputed that Passman forced the slot door closed after Anderson held the slot open, in violation of institutional rules. But, Anderson asserts in his verified Complaint that Gilpin had threatened to "chop [his] hand off" and offers evidence that Passman knew his hand was in the slot and did not give him time to comply with the command to remove his hand before slamming the slot door closed. Thus, genuine disputes exist regarding whether Anderson's hand was in the slot when Passman began to force it closed and, if so, whether Passman knew that it was there and gave him sufficient time to remove it before forcing the slot closed. Summary judgment is not appropriate on this ground. *See Washington v. Rounds*, --- F. Supp. 3d ----, 2016 WL 7015666, at *1, *6 (D. Md. Nov. 30, 2016) (denying summary judgment where the prisoner alleged "he was subject to excessive force when an officer slammed the cell door metal food slot onto his left hand, fracturing it" and the officer defendant countered that, "as he closed the slot, Washington stuck his left hand through the slot and the slot accidentally closed on his left arm"; reasoning that "plainly a material dispute [existed] as to Washington was interfering with and/or threatening correctional officers"

when Rounds closed the slot on his hand, such that "the factual allegations regarding the need for force, the extent of force used, and what injuries were sustained by Washington c[ould] not be resolved on the motions").

## QUALIFIED IMMUNITY

Defendants also argue for summary judgment on the basis of qualified immunity. *See* Defs.' Mem. 13.

> Qualified immunity shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether defendant government officials are protected by qualified immunity, the court considers both "whether a constitutional right [was] violated on the facts alleged" and "whether the right was clearly established" at the time of the conduct in question. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009).

*Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016). And, "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))). Nonetheless, "[t]here is no requirement that the 'very action in question [must have] previously been held unlawful' for a reasonable official to have notice that his conduct violated that right." *Id.* at 236 (quoting *Hope*, 536 U.S. at 739).

Defendants argue that "Plaintiff cannot establish that he has a clear right to impede an officer's duty to secure a cell door." Defs.' Mem. 14. Although that is true, it is not determinative, because Plaintiff did have a clear right under the Eighth Amendment to be free from cruel and unusual punishment. This clear right reasonably put the officers on notice that they could not slam Anderson's hand in the food slot unnecessarily. *See Scinto*, 841 F.3d at

235–36. As discussed, a reasonable jury could find on the record before me that Defendants violated Anderson's Eighth Amendment rights by intentionally forcing the food slot closed on his hand without giving him the opportunity to remove it. "Although a jury may ultimately decide that Defendants' version of events is more credible, we are barred from making such a determination when deciding whether to grant summary judgment based on qualified immunity." *Scinto*, 841 F.3d at 235 (citing *Meyers v. Balt. Cnty.*, 713 F.3d 723, 733 (4th Cir. 2013)).

For this reason, I will deny Defendants' motion; appoint counsel to represent the Plaintiff, and issue a scheduling order. A separate Order follows.


Dated: February 28, 2017                    _____/S/_____
                                            Paul W. Grimm
                                            United States District Judge